## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JACOB'S LIMOUSINE TRANSPORTATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> CITY OF NEWARK, CITY CLERK OF THE CITY OF NEWARK, in His Official Capacity, TAXICAB AND LIMOUSINE COMMISSION OF THE CITY OF NEWARK, TAXICAB DIVISION OF THE CITY OF NEWARK, MANAGER OF THE CITY OF NEWARK, in His Official Capacity, and CITY CLERK OF THE CITY OF NEWARK, in His Official Capacity, <br><br> Defendants. | CIVIL ACTION NO. <br><br> 09-6331 (MCA) (LDW) <br><br><br> **REPORT AND RECOMMENDATION** |

**LEDA DUNN WETTRE, United States Magistrate Judge**

Before the Court is plaintiff Jacob's Limousine Transportation, Inc.'s motion to enforce a settlement agreement. ECF No. 29. United States District Judge Madeline Cox Arleo referred this motion to the undersigned to conduct an evidentiary hearing and issue a Report and Recommendation. Having considered the parties' written submissions and the testimony and exhibits proffered at the evidentiary hearing before the Court, for the reasons set forth herein, and for good cause shown, this Court recommends that the motion to enforce be **DENIED**.

### I.     RELEVANT PROCEDURAL BACKGROUND

This action began in the Superior Court of New Jersey, Essex County, Law Division in September 2009. Plaintiff asserted claims in the action against the City of Newark, as well as certain of its Divisions and managers, for violating plaintiff's rights under the Due Process, Equal

Protection, and Privileges and Immunities Clauses of the United States Constitution, pursuant to 42 U.S.C. § 1983. *See* Complaint, ECF No. 1, at 8–29. Plaintiff principally contended that defendants hindered its efforts to license and operate an autocab[1] business within Newark, despite its preparedness to comply with all applicable laws and regulations, yet permitted various other entities to run autocab businesses that violated such regulations. *Id.* at 11–19. Plaintiff particularly alleged that other autocab businesses were operating without the required zoning approval for their facilities, insurance coverage, or business licensing. *Id.* Plaintiff sought $40 million in damages, as well as various forms of injunctive relief. *Id.* at 19–28. On December 16, 2009, defendants removed the action to this Court on federal question grounds. Notice of Removal, ECF No. 1, at 1–3.

The parties reported the case as settled in March 2011, and the action was terminated. ECF No. 12. The action was reopened, however, on May 24, 2011, due to a dispute over a term of the proposed settlement agreement that required plaintiff to repay settlement proceeds if it returned to court to pursue enforcement of the settlement. *See* ECF Nos. 13, 15. Defendants contended that plaintiff had initially consented to the repayment term and that the Newark City Council had approved the settlement with that term included, but that plaintiff then attempted to eliminate the repayment term before executing the settlement agreement. ECF No. 13. After several settlement conferences, the parties apparently agreed to settlement terms that would not require repayment of settlement proceeds in order to pursue enforcement of other terms, *see* ECF No. 20-2, at 4, and the action was again dismissed as settled on November 30, 2011. ECF No. 17.

---

[1]     Plaintiff has defined "autocabs" as "vehicles, other than taxicabs, that are pre-arranged for hire and transport by the passenger, with fares or prices agreed upon in advance between the autocab company and the passenger." ECF No. 124, at 1. Autocabs are treated separately from taxicabs and other for-hire vehicles by the Newark City Code. *See* Newark City Code § 34:2-1 *et seq*.

2

Pursuant to the settlement agreement entered into by the parties ("the Settlement Agreement"), the City of Newark was to pay plaintiff $300,000 and defendants in turn were obligated to "promptly and affirmatively assist and cooperate with [plaintiff] in order to enable [plaintiff] to obtain all necessary permits, approvals, licenses, and permissions to operate autocab, limousine, livery service in the City of Newark . . . as expeditiously as possible." ECF No. 20-2, at 2–3. The Settlement Agreement granted plaintiff the right, through August 31, 2014, to register up to 150 autocab vehicles, subject to the autocab laws in effect as of August 31, 2011. *Id.* at 4. The Settlement Agreement further mandated that Newark and its employees "shall continue their vigilance, enforcement efforts and supervision of all autocab, limousine, and livery services operating under the laws of New Jersey and the laws of the City of Newark, and they shall enforce diligently all such laws applicable to all autocab, limousine and livery services under their licensure." *Id.* at 5. The agreement provided that this Court would retain jurisdiction over the action for six months following its adoption by the Court. *Id.* at 4.

In February 2012, within the six-month period of the Court's retention of jurisdiction, plaintiff moved to enforce the Settlement Agreement, seeking an order requiring Newark to sign the Settlement Agreement, which at that point had been executed only by plaintiff. ECF No. 20. Newark adopted a resolution in favor of approving the Settlement Agreement in June 2012, but as of August 2, 2012, no representative had signed it. ECF No. 25. Therefore, on August 3, 2012, United States Magistrate Judge Joseph A. Dickson issued a Report and Recommendation finding the Settlement Agreement to be valid and enforceable as of June 7, 2012, despite Newark's failure to execute it, and recommending to District Judge Claire C. Cecchi that the motion to enforce be denied as premature. *Id.* Judge Cecchi adopted this Report and Recommendation on August 20, 2012. ECF No. 28.

3

Less than three weeks later, plaintiff made another motion to enforce the Settlement Agreement and sought an order compelling Newark to begin proceedings to shut down autocab companies allegedly operating in violation of the applicable laws and regulations. ECF No. 29. Judge Dickson issued a Report and Recommendation that recommended denying the motion without prejudice pending the deposition of the manager of Newark's Taxicab and Limousine Commission. ECF No. 39. Plaintiff filed an objection to the Report and Recommendation, in part for the reason that the manager of the Taxicab and Limousine Commission recently had stepped down and been replaced. ECF No. 41. Judge Cecchi, noting the change in circumstances, terminated the motion to enforce to permit further conferencing. ECF No. 42.

After plaintiff conducted further discovery and took additional depositions, the parties submitted new arguments in letter briefs. ECF Nos. 54, 60, 62. Plaintiff contended that defendants had been violating their duty to enforce the laws applicable to autocab companies, focusing heavily on the interrelationship between Newark's autocab regulations and its zoning regulations. ECF No. 54, at 2–6. In particular, plaintiff posited that Newark zoning regulations required autocab companies to store and park all associated vehicles at each company's principal place of business or base, thus limiting the number of vehicles dispatched by each company to the number of dedicated and City-approved parking spots at its principal place of business or base. *Id.* at 2–4. At Judge Dickson's request, the parties also submitted letters regarding delays in the process of paying the monetary portion of the underlying settlement and regarding an application by plaintiff's counsel for fees on the motion. ECF Nos. 66, 67, 68, 70, 71.

Judge Dickson issued another Report and Recommendation on April 2, 2014, in which he recommended denying plaintiff's motion to enforce, on the basis that the law did not support plaintiff's theory that Newark's zoning regulations limit the number of autocabs that a company may utilize in its business to the number of its parking spaces and because the Settlement

Agreement required Newark to make only diligent efforts to enforce its regulations, not to guarantee a complete absence of violations. ECF No. 77, at 6–8. Judge Dickson also observed that plaintiff seemed to bear fault for most of the delay in consummating the monetary portion of the settlement. *Id.* at 10–14.

Plaintiff filed a lengthy objection to this Report and Recommendation. ECF No. 78. Judge Cecchi thereafter referred the matter to Sheryl M. Goski, Esq. for mediation to conserve court resources and terminated the motion to enforce, granting plaintiff leave to refile if mediation failed to resolve the matter. ECF No. 81.

The mediation did not result in a settlement. At a proceeding before District Judge Madeline Cox Arleo on March 4, 2015, she directed the parties to complete further discovery, as previously directed by Mediator Goski. ECF No. 93, at 45–54. Judge Arleo specifically directed Newark to produce all autocab licenses, as well as accompanying applications, that were issued during 2014, and she instructed plaintiff's counsel to complete a deposition, under Federal Rule of Civil Procedure 30(b)(6), of a person with knowledge of the City's autocab licensing procedure. *Id.* at 47–48, 54.

Over the past year, this Court has conducted numerous conferences with counsel and has overseen extensive additional discovery. Once such additional discovery was adequately completed, the Court set an evidentiary hearing to be held in November 2015, with briefing of the issues in advance. The Court conducted a three-day evidentiary hearing on this matter—on November 16 and 17, 2015 on the issue of the alleged breaches of the Settlement Agreement and on March 14, 2016 on the alleged damages sustained by plaintiff in connection with the alleged

5

breaches of the Settlement Agreement.[2]  *See* ECF Nos. 137, 138, 156.  The parties filed post-hearing submissions in April 2016.  ECF Nos. 150, 155.

## II.    ANALYSIS

### A. Standard Of Review

A motion to enforce a settlement agreement is generally treated under the same standard as a motion for summary judgment.  *Natale v. E. Coast Salon Servs., Inc.*, Civ. A. No. 13-1254 (NLH), 2016 WL 659722, at *2 (D.N.J. Feb. 17, 2016); *U.S. ex rel. Pro-Spec Painting, Inc. v. Parsons Evergreene, LLC*, Civ. A. No. 09-533 (RBK), 2012 WL 3038587, at *3 (D.N.J. July 25, 2012); *U.S. ex rel. Haydon Bolts, Inc. v. Fid. & Deposit Co.*, Civ. A. Nos. 04-5708 (RBK) & 04-5709 (RBK), 2009 WL 3131284, at *3 (D.N.J. Sept. 28, 2009); *Leonard v. Univ. of Del.*, 204 F. Supp. 2d 784, 786 (D. Del. 2002), *aff'd* 80 F. App'x 286 (3d Cir. 2003).  Where questions of fact exist, however, the Court may take evidence and perform factfinding necessary to resolve the motion.  *Hobbs & Co. v. Am. Investors Mgm't, Inc.*, 576 F.2d 29, 34–35 (3d Cir. 1978); *Thorner v. Sony Computer Entm't Am. LLC*, Civ. A. No. 09-1894 (MLC), 2013 WL 1145200, *4 (D.N.J. Mar. 18, 2013); *Pro-Spec Painting, Inc.*, 2012 WL 3038587 at *3; *see also Dep't of Cmty. Affairs v. Thomas*, Docket Nos. DJ-225206-10 & DJ-232952-13, 2016 WL 363235, at * 2 (N.J. Super. Ct. App. Div. Feb. 1, 2016).

A settlement agreement is a form of contract.  *Natale*, 2016 WL 659722 at *2, *3; *Payer v. Berrones*, Civ. A. No. 12-1704 (RMB), 2015 WL 4715953, at *2 (D.N.J. Aug. 7, 2015).  Consequently, allegations of breached settlement obligations are governed by New Jersey contract

---

[2]    The gap in time between the November 17 and March 14 sessions was due to plaintiff's late disclosure of its intent to use expert witnesses just before the November 16, 2015 hearing, the subsequent delay in plaintiff's producing expert reports to defendants, and the lack of availability of plaintiff's experts and/or both side's counsel on earlier dates the Court proposed for the completion of the hearing.

law. *See Plymouth Mut. Life Ins. Co. v. Illinois Mid-continent Life Ins. Co.*, 378 F.2d 389, 391 (3d

Cir. 1967); *Natale*, 2016 WL 659722 at *2, *3; *Payer*, 2015 WL 4715953 at *2; *Thorner*, 2013

WL 1145200, at *4. As the parties here agree that a binding settlement agreement exists,[3] plaintiff

bears the burden of providing proof sufficient for the Court to find by a preponderance of the

evidence that plaintiff has shown that defendants breached a duty created by the Settlement

Agreement and that the breach caused plaintiff to suffer damages. *See Sheet Metal Workers Int'l*

*Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013);

*Spano v. JP Morgan Chase Bank, NA*, 521 F. App'x 66, 70 (3d Cir. 2013); *EnviroFinance Grp.*,

*LLC v. Envt'l Barrier Co.*, 440 N.J. Super. 325, 345 (App. Div. 2015).

## B. Alleged Breaches Of The Settlement Agreement

As the Court has concluded that the Settlement Agreement is enforceable, it must first

assess what duties the agreement created and what, if any, breach of those duties plaintiff has

---

[3]     Although defendants throughout this litigation acknowledged the validity and enforceability generally of the Settlement Agreement, *see* ECF No. 125 at 2, 7, they argued at the outset of the evidentiary hearing that the clause of the Settlement Agreement requiring them to enforce diligently the laws applicable to autocabs should be deemed unenforceable on the basis that this constitutes a preexisting legal duty that cannot be considered contractual consideration, ECF No. 125 at 7, 11–14. While a promise that recites a preexisting legal duty cannot *per se* comprise consideration sufficient to support a contract, *see, e.g., Merlo v. Fed. Express Corp.*, Civ. A. No. 07-4311 (GEB), 2010 WL 2326577, at *10–11 (D.N.J. May 7, 2010), defendants overlook the well-established tenet of contract law that each party need only make one promise supported by consideration to bind the parties to all promises made in the contract, *see Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999); *Beery v. Quest Diagnostics, Inc.*, 953 F. Supp. 2d 531, 546 (D.N.J. 2013); 3 Williston on Contracts § 7:51 (4th ed. 2015). Defendants do not contest that Newark's $300,000 payment to plaintiff, and other conditions of the Settlement Agreement, constituted valid consideration. Accordingly, the promises made in the Settlement Agreement are binding. Indeed, this principle is plainly stated by a case, though not controlling here, that defendants cited in their brief. *See Daigle v. West*, 225 F. Supp. 2d 236, 247 (N.D. N.Y. 2002) (noting that, though the contractual duties relevant to the action were preexisting duties, "there was other, valid consideration present in the Settlement Agreement which rendered it enforceable"). Defendants' extensive reliance on the opinion of the United States Bankruptcy Court for the District of Delaware in *In re Kaiser Aluminum Corp.*, Nos. 02-6531 (JFK) & 02-10429 (JFK), 2004 WL 97658 (Bankr. D. Del. Jan. 16, 2004), which considers the legal interest created by a preexisting duty in the context of a bankruptcy, does not suggest a different result.

established.  The majority of plaintiff's allegations on this motion to enforce concern the following clause of the Settlement Agreement, entitled "PERFORMANCE AND ENFORCEMENT BY THE MUNICIPAL PARTIES":

> 1.      The Municipal Parties and all of their employees, officials, representatives, agents and consultants shall continue their vigilance, enforcement efforts and supervision of all autocab, limousine, and livery services operating under the laws of New Jersey and the laws of the City of Newark, and they shall enforce diligently all such laws applicable to all autocab, limousine and livery services under their licensure.

ECF No. 124-5 at 5.  In connection with the responsibilities created by this paragraph, plaintiff alleges that defendants failed to "enforce diligently" various provisions of the Newark City Code. ECF Nos. 124-1, at 17–24, 124-2, at 25–35.

Before examining each of plaintiff's contentions of breach, a brief description of the legal landscape is necessary to place the parties' arguments in context.  Autocabs and their operation are generally governed by title 34, chapter 2, of the Newark City Code, titled "AUTOCABS, LIMOUSINES AND LIVERY SERVICE" ("the Autocab Code").  Newark City Code § 32:2-1 *et seq*. As prerequisites to autocab operation, the Taxicab Division of the Newark Police Department issues licenses for each vehicle to be used as an autocab ("autocab licenses") and to each driver who will operate an autocab ("driver licenses").  Newark City Code § 34:2-2. The License Unit of Newark's Division of Tax Abatement and Special Taxes also must issue a business license to each entity seeking to operate an autocab business within the City ("business licenses").  *See* Plaintiff's Hearing Exhibit ("P. Exh.) 42 (Shorte Dep. Tr.), at 20–50 & Shorte Dep. Exhs. P-1 to P-4. Each type of license is subject to regular renewal by the appropriate City office.  Pl. Exh. 40 (Pierre Dep. Tr.), at 70–75; Pl. Exh. 42 at 42–43.

The Taxicab Division also distributes a document entitled "Compliance Requirements for Obtaining a Business License for an Autocab/Dispatch License," which enumerates steps an

applicant must complete to receive a business license ("the Ten Steps").[4]  ECF No. 30-9, at 1–2;

Pl. Exhs. 5, 44.  Autocab company facilities, like any other Newark property, are also subject to

the Newark Zoning & Land Use Regulations ("NZLUR"), and particularly relevant portions of

this code are referenced below.  *See* Newark City Code § 40:1-1 *et seq.*

Plaintiff contends that various portions of the Autocab Code, the NZLUR, and the Ten

Steps operate to cap the number of autocabs that may be licensed to each autocab company based

on the number of parking spots maintained at the company's principal place of business,[5] and

plaintiff's primary theory of breach consists of allegations that defendants have issued autocab

licenses far in excess of such caps.  ECF Nos. 124-1 at 17–24, 124-2 at 25–29.    Plaintiff also

alleges that defendants have failed to enforce applicable zoning requirements against other autocab

companies, ECF Nos. 124-1 at 23–24, 124-2 at 25–26, 29–33, and have failed to enforce the

provision of the autocab code barring autocabs from parking on city streets, ECF Nos. 124-2 at 27,

124-3 at 37–48.  Plaintiff further asserts that competing autocab companies are violating an

Autocab Code requirement that autocab companies own all affiliated vehicles.  ECF No. 124-1 at

18.    It alleges that defendants lack sufficient familiarity with the terms of the Settlement

Agreement, ECF Nos. 124-1 at 23–24, 124-2 at 27–28, 32, and that defendants have breached their

obligation to expedite plaintiff's autocab licensing applications, ECF No. 124-2 at 35.  Finally,

plaintiff contends that defendants have failed to prove that all autocabs operating within Newark

have completed properly the required licensing procedure.  ECF No. 124-2 at 34–35.  Each of

plaintiff's contentions of breach is addressed in turn below.

---

[4]    Plaintiff has introduced two different versions of this document, which the Taxicab
Division apparently revised at some point.  While formatting and details have been altered, the
requirements are substantially the same.  *See* Pl. Exhs. 5, 44.

[5]    "Principal place of business" is a term specifically defined by the Autocab Code, as
discussed *infra*.  *See* Newark City Code § 34:2-1.

9

### 1. *Alleged Failure to Limit Issuance of Autocab Licenses Based on Available Parking*

Plaintiff's primary argument is that an autocab company licensed by Newark is required by law to have as many off-street parking places at its principal place of business in Newark as it has autocabs in its fleet. Plaintiff argues that Newark's licensing of many more autocabs than the autocab companies can store on their Newark business properties has led to a glut of autocabs in Newark that has, in turn, caused plaintiff harm in terms of impeding the anticipated growth of its autocab business. Because the Court finds that no such requirement exists under Newark's laws, plaintiff's argument of breach on this ground fails.

Plaintiff relies primarily on section 34:2-3 of Newark's Autocab Code in making its argument. That section provides as follows:

> The principal place of business or base can only be located in those districts permitted by local zoning ordinances and shall not be combined with any residential property and/or any other business. **All autocabs shall be garaged and shall not be stored and/or parked on the streets of the City of Newark.**

Newark City Code § 34:2-3 (emphasis added). "Principal place of business" as used in this section is defined as "the place or location of the business within the City of Newark where the autocabs are dispatched, stored and/or parked." Newark City Code § 34:2-1. "Base" as used in this section is defined as "a place of business from which autocabs are dispatched." *Id.*

The Court starts with the statutory language of the foregoing code sections to determine the merits of plaintiff's argument. In construing the meaning of a statute or regulation, a court must begin with the statutory language and assume the ordinary meaning of such. *Nebraska v. Parker*, 136 S. Ct. 1072, 1079 (2016); *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013). As plaintiff notes, statutory construction further precludes the Court from adopting "a construction that would render any word in the statute to be inoperative, superfluous or meaningless." ECF No. 124-1 at 19 (citing *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 204 (1999)).

Section 34:2-3 on its face does not require an autocab company to have as many off-street parking places at its site in Newark as it has cars in its fleet.  Parsing the language, the first requirement of this section is that an autocab company's principal place of business or base be in a permitted zoning district and not combined with another business or with residential property. The second requirement is that "all autocabs shall be garaged"; it does not state *where* they should be garaged.  The third requirement is that autocabs "shall not be stored and/or parked on the streets of Newark."  This plainly prohibits autocabs from being parked on Newark streets, but again it does not provide where they should be kept.  Thus, none of these requirements *per se* supports plaintiff's interpretation that there is required to be on-site storage in Newark for all autocabs in a Newark-licensed autocab company's fleet.

Plaintiff argues that section 34:2-3 nevertheless should be interpreted to mandate on-site parking at a Newark autocab site of an autocab company's entire fleet when read in conjunction with other sections of the Autocab Code.  In particular, plaintiff asserts that section 34:2-3 should be read together with the code's definition of "principal place of business" as "the place or location of the business within the City of Newark where the autocabs are dispatched, stored and/or parked."  Newark City Code § 34:2-1.  Plaintiff contends that these two sections—the first mandating the garaging of autocabs *somewhere* and barring storage or parking on city streets and the second defining the principal place of business as a location in Newark "where the autocabs are dispatched, stored and/or parked"—impose a requirement that all autocabs be parked or stored at the autocab company's principal place of business in Newark.  ECF No. 124-1 at 18–21.

But such a construction would not be consistent with a plain reading of these code sections and improperly would render certain of the statutory language superfluous.  Because the definition of "principal place of business" is a location where autocabs are "dispatched, stored **and/or** parked" (emphasis added), the "or" in that definition means that an autocab company may have a

11

principal place of business in Newark from which autocabs are *only dispatched* and not also stored

or parked. "Dispatch" is defined under the code as "an instruction to a driver by a base to provide

transportation to a passenger who has previously arranged for such transportation with the base."

Newark City Code § 34:2-1. Therefore, if an autocab company's principal place of business is

only a dispatch site, *i.e.*, a site from which an instruction is sent to autocab drivers to pick up a

passenger (as the evidence shows most of them are, and as plaintiff acknowledges, *see* ECF No.

124 at 18), then the autocab company's principal place of business need not be a place where *any*

of the autocabs are "stored" or "parked," much less a place where *all* of its affiliated cars are stored

or parked. It may only be a dispatch site, with the autocabs stored or parked elsewhere.[6]   In this

---

[6]      A logical next question would be: "If an autocab company's principal place of business is
only a dispatch site, where would its autocabs be permitted to be parked?" The practical answer
that came to light from the testimony adduced during the evidentiary hearing before the Court is
that autocab licenses are often obtained by individuals who own an autocab and are affiliated with
an autocab company, as opposed to the licenses being obtained by autocab companies themselves;
therefore, those individuals arrange themselves for the storing or parking of the vehicles when they
are not in use. Nov. 16, 2015 Hearing Tr., ECF No. 138, at 55–57, 139–40. These drivers pay a
fee to have fares dispatched to them from a Newark autocab company. *Id.* at 41–44. That there
will be individual owners of autocabs who are affiliated with a Newark autocab company clearly
is permitted by Newark's autocab laws, which provide that in order to obtain an autocab license
from Newark, the owner or operator of an autocab must merely "be affiliated and/or associated
with a base." Newark City Code § 34:2-2(b). Although plaintiff tried to make much of these
drivers as unpermitted "independents," it introduced no evidence to show that an autocab company
must own the cars used in its business or that an individual autocab owner could not make his own
garaging arrangements for his vehicle. Each autocab license holder called as a witness
demonstrated, often with documentary support, that he was affiliated with a Newark autocab
company.
        To the extent that plaintiff argues that an autocab owner would *per se* violate Newark's
zoning ordinance were he to make his own parking arrangements, on the theory that the owner
would park the car in a residential district in Newark (which plaintiff alleges would violate the
NZLUR), that is not a fair assumption. An autocab owner or operator must obtain a Newark
autocab license if:

>              "1.     His or her principal place of business is in the City of
> Newark;
>              "2.     His or her base is in the City of Newark; *or*
>              "3.     The majority of his or her autocab business is in the City of
> Newark."

case, which seems to be the norm for Newark autocab companies other than plaintiff, there is no legal requirement that parking be available for all autocabs in the company's fleet at the company's principal place of business or base in Newark.   The Court therefore disagrees with plaintiff's assertions that such a requirement exists and that Newark's failure to enforce it constitutes a breach of the Settlement Agreement.

To the extent that plaintiff points to other code sections in support of its argument, none of those other sections supports the conclusion that plaintiff urges the Court to reach.  Plaintiff argues, for instance, that Newark City Code § 40:4-8(b)(1) (in effect prior to the adoption of new zoning and land use regulations in February 2015) supports its argument that an autocab company must have sufficient on-site parking for its entire fleet.  That section provides:

> Adequate vehicle storage and queuing areas shall be provided on site.  For car wash, a queuing area capable of holding at least eight (8) cars shall be required leading to the entrance to the wash areas.  For automobile sales, body repair, or service, an area is required on site for all vehicle maneuvering and repositioning of inventory. In addition, customer parking at a rate of one (1) customer per four (4) cars in inventory to sell is required.  For automobile body repair, spray booths are not permitted at any facility located within one thousand (1,000) feet of a property used for residential use.

Newark City Code § 40:4-8(b)(1).  Plaintiff has failed to demonstrate, however, that this provision applies to autocab companies.  The section applies only to the following vehicle-related business: "automobile sales; automobile body repair; automobile service; car wash; . . . [and] gasoline filling stations."   Newark City Code § 40:4-8(a).  "Autocab" has its own definition separate from "automobile, sales and repair" and "automotive service station or gasoline filling station" under the Code.  *See* Newark City Code § 40:1-1.3.  As section 40:4-8(a) nowhere indicates that the

---

Newark City Code § 34:2-2(a) (emphasis added).  The foregoing obviously contemplates situations in which the autocab owner will—and may—reside outside of Newark.  Moreover, even if the autocab owner resided in Newark, the Court cannot assume that they will be parking the vehicle in violation of the Autocab Code or the NZLUR.  No such evidence was presented by plaintiff.

provisions of 40:4-8 apply to autocabs, section 40:4-8(b)(1) appears on its face to be inapplicable. Plaintiff presents no authority to convince the Court otherwise.[7]

Moreover, even if section 40:4-8(b)(1) did apply, it would require only that there be "adequate vehicle storage" on site. With no other language as to what amount of vehicle storage is "adequate," assessing the propriety of a facility's vehicle storage space appears to have been left to the discretion of the Zoning Board or Planning Board. The Court has been provided no basis on which to conclude that "adequate vehicle storage" means one parking space per vehicle in an autocab company's fleet.

Plaintiff further argues that parking requirements in the current version of the NZLUR that went into effect in February 2015, though not applicable to the autocab facilities presently operating, reflect that the City always required one parking space per vehicle at an autocab company's principal place of business. ECF No. 124-1 at 20–21. The current NZLUR requires "Operation Facilities for Bus/Taxicab/Ambulance/Limousine" to have "1 [parking] space for employee and 1 space for each vehicle used in operations." Newark City Code § 40:7, table 7-2 (2014); *see also* Newark City Code § 40:2-2 (2014) (defining "Operation Facilities for Bus/Taxicab/Ambulance/Limousine" as "an area and/or building where four (4) or more emergency medical ambulances, buses, taxicabs or other livery vehicles are stored, dispatched and/or loading and unloading is carried on regularly, and where minor maintenance of these vehicles is performed"). The Court, however, has been presented with no evidence that these new regulations, made effective in February 2015—long after the motion to enforce was filed—were intended to clarify the meaning of the earlier zoning regulations. To the contrary, the new parking

---

[7]     Plaintiff argues in its briefing that "autocab dispatch offices and use were understood as automotive services by both municipal boards," ECF No. 129 at 19, (emphasis in original), but provides no supporting citation for such assertion. The Court cannot accept such an assertion as accurate with no supporting authority.

14

requirements on their face are strictly prospective in that they are limited in their application to new facilities, significantly expanded facilities, post-2014 facilities that undergo a change of use, or facilities that change to a use not typically permitted in the relevant zone. *See* Newark City Code §§ 40:7-1-1, 40:7-1-2 (2014). No legislative history or any other authority has been provided to the Court to indicate that these new regulations were intended to make explicit requirements that were implicit under the prior regulatory scheme.

Moreover, in construing the meaning of a statute, a municipality's informal interpretation of its own ordinances is entitled to deference, *Fallone Props., L.L.C. v. Bethlehem Twp. Planning Bd.*, 369 N.J. Super. 552, 561 (App. Div. 2004), and "zoning laws are liberally construed in the municipality's favor," *Rumson Estates, Inc. v. Mayor & Council of Fair Haven*, 177 N.J. 338, 351 (2003); *N.J. Shore Builders Ass'n v. Twp. of Jackson*, 401 N.J. Super. 152, 161 (App. Div. 2008), *aff'd*, 199 N.J. 449 (2009). In this case, proof was presented to the Court that Newark did not interpret its zoning laws to require on-site garaging of all autocabs used in the business at an autocab company's principal place of business. Plaintiff presented deposition testimony of a zoning officer of Newark, Ade Afolabi, in which Afolabi testified that Newark's zoning ordinances required only that an autocab company not store at its site more vehicles than it could garage there. He specifically stated that any additional autocabs in the fleet that were not stored on the Newark business site were not relevant to compliance with the zoning ordinances. Pl. Exh. 41, July 18, 2013 dep., at 51:22 to 57:5.[8]

---

[8]    Although defendants objected to plaintiff's introduction of this deposition transcript as evidence, primarily on the grounds that plaintiff could have subpoenaed Mr. Afolabi to testify live at the evidentiary hearing, their objection is misplaced. To the extent this motion to enforce is akin to a summary judgment motion, and given that the Court would be entitled to consider the sworn deposition testimony of a party on summary judgment, the Court may consider the deposition testimony on this motion. To the extent that the Court relies in this Report and Recommendation upon other exhibits introduced by plaintiff to which defendants object, defendants' objections are overruled.

In addition, an exhibit introduced by plaintiff at the evidentiary hearing, Pl. Exh. 22, demonstrates a conditional-use approval by the Newark Central Planning Board of an autocab company's dispatch site (that of Friends Limo LLC a/k/a Ecuamerica Car Service, LLC), where the resolution approves as "meet[ing] all requirements for conditional use approval," a site that had only "six . . . parking spaces for storage of that company's approximately 20 limousines." The resolution further provides that "no more than six of the applicant's vehicles, for which parking spaces are provided, are to be kept at this site or on the streets immediately adjacent to this site at any time." *Id.* at 3. Therefore, Newark's interpretation of its zoning laws, which harmonizes with the Court's reading of the plain meaning of those ordinances, further supports the absence of the parking requirement asserted by plaintiff.[9]

Given a plain reading of the laws and regulations on which plaintiff relies, the Court finds no basis for the contention that defendants have breached their legal duties by failing to enforce a cap (equal to the number of cars that can be stored at an autocab company's principal place of business) on the number of autocabs that may be licensed by or affiliated with a particular autocab company. As the meaning of the code provisions in question here is facially clear, the Court recommends that all of plaintiff's arguments and relief premised on a theory that autocab licenses are legally capped by an autocab company's quantity of parking spaces at its Newark place of business be rejected.

### 2. *Alleged Failure To Ensure Autocab Facility Zoning Compliance*

Plaintiff also argues, relying largely on the requirements for obtaining an autocab business license enumerated in the Ten Steps published by the Newark Police Department's Taxicab

---

[9]     Moreover, the Court notes that plaintiff's zoning approval nowhere mentions approval for a specific number of autocabs to be parked at plaintiff's site in Newark. *See* Pl. Exh. 14. Plaintiff was unable to explain to the Court's satisfaction how his City approval was any different from that of other autocab companies he asserts do not have zoning approval. *See* ECF No. 156 at 57–65.

Inspection Unit, that defendants have breached their duties to enforce laws applicable to autocabs and autocab companies by issuing or renewing business licenses without first ensuring that the company's facility complies with all zoning requirements.  ECF Nos. 124-1 at 17, 23–24, 124-2 at 25–26, 29–33.  The substantial portion of these arguments that relate to plaintiff's contentions as to parking requirements need not be addressed, based on the Court's rejection of plaintiff's argument that Newark's ordinances require one parking space at an autocab facility for each car in the autocab company's fleet.  The Court addresses plaintiff's remaining arguments, concerning defendants' alleged lack of enforcement against autocab companies of other legal requirements.

As an initial matter, the Court notes that the Ten Steps document is an information summary for a prospective business license applicant to guide the applicant through the approvals and paperwork required to obtain an autocab business license.  *See* Pl. Exh. 40 at 13 (deposition testimony of Fedy Pierre, manager of the Taxicab Inspection Unit, who stated that the unit "did this form to help [applicants] out, show them what departments they have to go to").  The Ten Steps document is not itself an ordinance or statute with the force of law.  What is contained in the Ten Steps, however, is reflective of what is required to obtain a business license.  Given this, the Court analyzes whether plaintiff has provided proof that Newark has failed to enforce diligently its autocab laws by issuing business licenses to autocab companies that have not complied with the requirements for obtaining such a license.  These legal requirements, as reflected in the Ten Steps, ultimately are zoning approval and a certificate of occupancy (for which City inspections are first required).  See Pl Exhs. 5 and 44.  In reviewing the evidence to make this determination, the Court bears in mind that it is plaintiff's burden as the party asserting breach to demonstrate a lack of compliance, rather than Newark's burden to prove its compliance.

Plaintiff does not meet its burden of demonstrating that other autocab companies were issued business licenses without having zoning approvals and certificates of occupancy.  Plaintiff

17

had the opportunity to call as witnesses at the evidentiary hearing representatives of Newark and

of the various autocab companies to examine whether those companies were in compliance with

the autocab laws.   Plaintiff did subpoena several principals of competing autocab companies to

testify at the hearing and to bring with them documentary proof of their authorizations from

Newark to conduct autocab businesses.   But plaintiff did not establish a lack of compliance through

their testimony or the subpoenaed documents.   To the contrary, significant proof of the other

autocab companies' *compliance* was elicited, both in discovery and at the evidentiary hearing.   *See*

for Ecuamerica Car Service, LLC (258 South Street): ECF No. 125-2, at ECF pp. 1, 8–11; Pl. Exh.

22; Pl. Exh. 49, ¶ 16; Pierre Dep. Exhs. 15, 19  (evidence of zoning approval); Pierre Dep. Exhs.

15, 19 (certificate of occupancy, City inspections and business license obtained); for Family Auto

Cab, Inc. (669 to 671 South 16th Street):  ECF No. 125-2 at ECF pp. 2, 19; Pl. Exh. 25 (evidence

of zoning approval); Pierre Dep. Exh. 18 (certificate of occupancy, City inspections and business

license obtained); for Gemini Auto Cab Service, LLC (408 Elizabeth Avenue):  ECF No. 125-2 at

ECF pp. 1, 15–18, Pl. Exh. 24: Pl. Exh. 49, ¶ 21; Pierre Dep. Exh. 20 (evidence of zoning approval

and city inspections); Pierre Dep. Exhs. 14, 20 (certificate of occupancy and business license); for

Gold Lincoln Services (140-142 Walnut Street): ECF No. 125-2 at ECF pp. 1, 4–7; Pl. Exhs. 6-a,

6-b; Pl. Exh. 21; Pl. Exh. 49, ¶ 22; Pierre Dep. Exh. 21 (evidence of zoning approval); Pl. Exh. 6-

d (certificate of occupancy); Pl. Exh. 6-e; Pierre Dep. Exh. 21 (business license); Pierre Dep. Exh.

21 (city inspections); Nov. 16, 2015 Hearing Tr., ECF No. 138 at 108–09 (Mr. Lucio Lemmo,

President of Gold Lincoln, testified to the approvals he obtained from the City of Newark to

operate his dispatch site); for International Express Car Service Corp. (196 Miller Street):  ECF

No. 125-2 at ECF pp. 1, 12–14; Pl. Exh. 23 (evidence of zoning approvals); Pl. Exh. 10a (certificate

of occupancy); Pierre Dep. Exh. 13 (City inspections and business license); for Transunion Car

Service (191 Central Avenue):  ECF No. 125-2 at ECF p.1; Pl. Exh. 43 (evidence of zoning

approval); Nov. 16, 2016 Hearing Tr., ECF No. 138 at 124–29 (Fedy Pierre, manager of Newark's

Taxicab Division, testified that he oversaw Transunion's completion of all ten steps of the Ten

Step protocol).

      Plaintiff's main evidence that a competing autocab company is not in zoning compliance

was its introduction of a Cease And Desist Order from the City of Newark to Milenios/Classic

autocab company dated January 30, 2008, Pl. Exh. 3), more than four years before the Settlement

Agreement in this case was entered.   Pl. Exh. 3.   But plaintiff failed to carry its burden of

demonstrating through testimony or documentary evidence that Milenios/Classic has operated

since the effective date of the Settlement Agreement without the required city approvals.

      In fact, the evidence tended to be to the contrary.   The City of Newark provided a response

to a formal information request from plaintiff indicating that Milenios' nonconforming use of the

property was "grandfathered," in that it preceded the enactment of ordinances prohibiting such

use.   ECF No. 125-2 at ECF p.1 ("894 Broadway is a legal non-conforming Dispatch

Service/Livery Transportation and has been utilized as such since July 2, 1998.   This use was

established prior to the zoning ordinance prohibiting such use, therefore the use is grandfatherered,

so long as there is no change."); *see also* Pl. Exh. 49 ¶ 26 (noting that Newark maintains a

document showing that the site "was issued a Certificate of Continued Occupancy ("CCO") on

July 2, 1998 for a Dispatch Service operation . . . [which] demonstrates that Milenio Express

received the appropriate approvals from the City of Newark Central Planning Board, because

absent Planning Board approval, Milenio Express could not have received a CCO.   As such

Milenio Express is in compliance.").   In addition, Milenios' principal, Hermel Valencia, who was

subpoenaed to testify at the evidentiary hearing, demonstrated that his business had obtained a

certificate of occupancy and showed that the business had passed City inspections. *See* Pl. Exh. 4

at facsimile page 19/27; Nov. 16, 2015 Hearing Tr., ECF No. 138 at 47–49, 53.   This was

substantiated by documents produced by Newark in discovery. *See* Pierre Dep. Exh. 17 (consisting of Milenios' Business License, Police Department Approval, Certification of Continued Occupancy, and permits). Mr. Valencia further testified that he followed all the steps required to get a business license from the City of Newark and got no special treatment from Newark when he opened his business. Nov. 16, 2015 Hearing Tr., ECF No. 138 at 83–85.

In contrast, plaintiff presented no evidence to support its arguments that Milenios/Classic has operated since the date of the Settlement Agreement in violation of Newark law. As with many of plaintiff's contentions of breach, plaintiff's counsel raised numerous *questions* as to whether the evidence before the Court was sufficient to demonstrate compliance. But plaintiff failed to meet its burden of proving that any of the other autocab companies is *not* in compliance, despite the opportunity it was given to conduct discovery and call witnesses at a three-day evidentiary hearing. It is plaintiff's burden as claimant and movant to do more than raise doubts as to whether *defendants* demonstrated compliance. Defendants cannot be found by this Court to be in breach based on such a record.

The Court finds plaintiff's further contentions of defendants' noncompliance with zoning laws similarly unavailing.[10] Plaintiff argued, for instance, that in one or two instances, other autocab companies' business licenses were dated a number of days prior to the date of the Zoning Department's approval stamp, *see, e.g.,* Pierre Dep. at 70–71, despite Newark official Tracie Shorte's deposition testimony that it was her practice to sign a business license only after zoning and other approvals had been obtained. Plaintiff never asked Ms. Shorte at deposition about the

---

[10]   Because of the scattershot manner in which plaintiff's arguments were presented to the Court, with numerous allegations of noncompliance by defendants being made in passing in plaintiff's written submissions, most often without a citation of law or evidence to support the argument, the Court does not address each and every argument suggested by plaintiff's written submissions. It addresses only those that were squarely presented, with citation to some evidentiary or legal support.

date discrepancies, nor did he call her as a witness at the evidentiary hearing. Therefore, the evidence merely suggests that Ms. Shorte did not follow her normal protocol in a handful of instances. Of course, it is equally possible that the date on the business licenses at issue were typed incorrectly or that Ms. Shorte was advised orally by the Zoning Department of their approval before signing the business license. The point is that plaintiff, the party with the burden of proof, showed only that a Newark official may have varied on a few occasions from her normal protocol, not proof by a preponderance of the evidence that defendants breached a legal duty.

### 3. *Alleged Failure Of Newark To Enforce Off-Street Parking Requirements For Autocabs*

Plaintiff also contends that other autocab companies violated section 34:2-3 of the Autocab Code by parking or storing associated autocabs on the streets of Newark. ECF Nos. 124-2 at 27, 124-3 at 37–38. In support of this, plaintiff submits a video purporting to prove this allegation. Pl. Exh. 17. The first half of this somewhat grainy video consists of a montage of rapidly cut shots, filmed from a moving car, of autocabs stopped along streets.[11] It begins by purportedly showing a stretch of two or three city blocks in Newark at three times of day on July 28, 2013, on which a number of autocabs associated with Family Auto Cab, Inc. are stopped along the curb.[12] It then purports to show sections of Newark's Broad Street and streets adjacent to Newark's two train stations on July 29, 2013, along which there are some autocabs stopped by the curb.[13]

---

[11]   The second half of the video is a virtual tour of plaintiff's autocab facility.

[12]   The number of autocabs in these clips is impossible to assess accurately given that certain cars are included in multiple clips (as identifiable by the autocab numbers on the side or rear of the vehicle). Furthermore, while some appear as if they may be parked, other autocabs have lowered windows or drivers visible inside.

[13]   It is again difficult to quantify these autocabs given the different shots, which sometimes clearly depict the same vehicles from varying angles or depict vehicles that are in the process of pulling up to or away from the curb. These shots seem also to show numerous autocab drivers in or around the vehicles.

The Court first observes that plaintiff has not introduced sufficient testimony to lay an evidentiary foundation for the admission of this video.  Nonetheless, even if this exhibit could properly be considered on this motion, it fails to demonstrate breach of defendants' obligations under the Settlement Agreement.  A short video showing some autocabs stopped along city streets, on two days that are now almost three years ago, is insufficient to demonstrate that defendants have breached their obligation to enforce the Autocab Code, particularly given the impossibility of accurately quantifying the autocabs featured in the video and the lack of context for why autocabs are stopped or waiting in certain locations.[14]  Additionally, defendants' duty to enforce diligently the laws as to autocab companies does not impose on them an impossible standard of enforcement.  Defendants cannot be deemed to have breached the Settlement Agreement on any occasion that an autocab-related law is violated but the violating party is not caught.  This anecdotal evidence of a possible violation of Newark's laws that presumably went unpunished establishes no more than that.

### 4.  *Alleged Failure To Require Ownership Of All Affiliated Autocabs By Autocab Company*

Plaintiff further argues that section 34:2-8 of the Autocab Code requires all autocabs to be owned by the autocab companies, and not by individual drivers, and complains that many autocabs are operated by "independent contractors," who pay an autocab company for the right to affiliate with it. *See* ECF No. 124-1 at 18.  That section states, in relevant part, that "[n]o autocab license or driver's license shall be issued or renewed unless the applicant . . . [f]urnishes written proof

---

[14]   For example, there is no way to know whether the autocabs stopped outside the train stations had just dropped off or were waiting to pick up patrons who had previously arranged for their services.

that the applicant is the owner, lessee, employee, agent or servant of the owner of the autocab, limousine or livery service." Newark City Code § 34:2-8(f).

Once again, plaintiff's interpretation of the city's autocab is not supported by the plain language of the statutes at issue. The language upon which plaintiff relies does not restrict the issuance of autocab licenses to autocab company owners. It requires only that an autocab license applicant prove that he or she "is the owner, *lessee, employee, agent or servant* of the owner of the autocab . . . service." Newark City Code § 34:2-8(f) (emphasis added). Because an autocab driver who owns his own autocab but is affiliated (as required) with an autocab company may be deemed a "servant" of the autocab company, no violation of section 34:2-8 has been shown.

In addition, section 34:2-7 only requires an autocab license applicant to be an "owner, lessee, bailee or driver of the autocab." Newark City Code § 34:2-7(a). This section, too, allows an individual autocab owner or driver to obtain a license. *Id.* It does not require the license holder to be the owner of an autocab company.

### 5. *Alleged Lack Of Familiarity With The Settlement Agreement*

Plaintiff contends that various representatives of defendants who were deposed or prepared certifications in connection with this motion to enforce indicated that they had little or no knowledge of the terms of the Settlement Agreement. ECF Nos. 124-1 at 23–24, 124-2 at 27–28, 32. While plaintiff's concern is understandable, it establishes no duty, contractual or otherwise, for any specific city representative to have knowledge of the Settlement Agreement. There is no indication that mere ignorance of its terms can constitute an independent breach. In any event, to the extent plaintiff primarily alleges that defendants violated the Settlement Agreement by failing to comply with the clause of the agreement that simply requires them to enforce applicable law, the Court notes that defendants and Newark's employees are bound to enforce such laws whether or not they specifically were aware that the Settlement Agreement also imposed an identical duty.

23

### 6. *Alleged Failure To Expedite Plaintiff's License Applications*

Plaintiff further makes allegations that defendants breached their duty in the Settlement Agreement to process autocab license applications from plaintiff within seven days. *See* ECF No. 124-2 at 35. In support of this theory, plaintiff relies on statements by former Newark official Fedy Pierre of the Taxicab Inspection Unit to the effect that the requisite driver's examinations were given only every few months. *See* ECF No. 124-2 at 35. Plaintiff has failed to demonstrate a breach, however, as plaintiff introduces no evidence that it in fact attempted to license additional autocabs. Plaintiff's principal, Mr. Joseph, acknowledged in response to the Court's inquiry at the evidentiary hearing that he did not after initially licensing 24 autocabs in 2012 seek to license any additional autocabs with the City of Newark. Mar. 14, 2016 Hearing Tr., ECF No. 156, at 29–30. Therefore, whether or not Newark conducted driver's examinations with the frequency plaintiff argues is warranted, Newark's conduct has not been shown to have impacted plaintiff adversely.

### 7. *Alleged Failure Of Newark To Prove It Licensed All Autocabs That Are Operating*

At the outset of the post-mediation proceedings, Judge Arleo directed defendants to produce copies of all autocab licenses issued in 2014. ECF No. 93 at 46–49. This Court further ordered defendants to produce copies of all such autocab licenses by May 15, 2015. *See* ECF Nos. 98, 99. While defendants, in response to plaintiff's interrogatories, indicated that there are 588 autocabs operating in Newark, ECF No. 125-3, plaintiff complains that defendants produced copies of only 246 autocab licenses and approximately 440 motor vehicle registrations, ECF Nos. 124 at 13, 124-2 at 34–35, 129-2 at 23–24. Consequently plaintiff contends that this establishes that "about 290 autocabs are operating without licenses and about 145 autocabs are operating without motor vehicle registrations" and that defendants are failing to properly supervise the issuance of autocab licenses. ECF No. 124-2 at 34–35. Defendants, in response, assert that they have "made a good faith effort to produce all documents responsive to Plaintiff's voluminous

24

requests, despite Newark's limited staff, it being under fiscal monitor, its employees not having the opportunity for overtime, its responsibilities unrelated to this litigation, and all of its documents being stored as paper." ECF No. 155 at 3.

Plaintiff, in essence, asks the Court to infer that defendants' failure to produce a substantial portion of the autocab licenses (and related motor vehicle registrations) that presumably had been issued demonstrates that many vehicles have been operating without proper licenses or registrations. *See* ECF No. 124-2 at 34–35. While such an adverse inference may be permissible when a party has engaged in intentional spoliation of evidence, *see Ward v. Lamanna*, 334 F. App'x 487, 492 (3d Cir. 2009), the Third Circuit has characterized such an adverse inference as an "extreme remedy," *McAdams v. U.S.*, 297 F. App'x 183, 187 (3d Cir. 2008). Newark's apparent inability to produce theses licenses and registrations is unquestionably troubling, but there is no indication that this failure was in any way willful or strategic. Nothing on the face of the licenses and registrations defendants did produce suggests any improprieties in the licensing procedure, and plaintiff has provided no affirmative proof of vehicles operating as autocabs without the requisite licenses or registrations. Indeed, plaintiff's contention that "almost 290 autocabs" may not be licensed relies on a logical fallacy, insofar as it is unclear how Newark would have any basis for asserting that 588 autocabs operate within the city without at some time having recorded the licensing of such vehicles. While the evidence produced may indicate poor records management by defendants, it fails to demonstrate that any autocabs are in fact operating without having completed the licensing process.

In addition, there was some evidence adduced at the evidentiary hearing that tended to show that Newark is regularly enforcing the licensing of all autocab drivers. Hermel Valencia, the owner of Milenios/Classic autocab company testified at the hearing that all of his company's affiliated drivers are required to show a current autocab license from the City of Newark before

they are permitted to drive for the company. Nov. 16, 2015 Hearing Tr., ECF No. 138 at 82. As Milenios is the largest autocab company currently operating in Newark, with 210 cars and 260 drivers, Pl. Exh. 35 at 4, that testimony provides some assurance that the licensing and registration laws have been enforced and that there have not been unlicensed drivers operating autocabs in Newark. In any event, plaintiff provided no evidence, as it must to prove breach, that Newark is *not* enforcing the licensing laws. Defendants' failure to produce copies of all the licenses and registrations for the year 2014 under the circumstances does not in and of itself justify the drawing of an adverse inference that they breached their duties in that regard.

### C. Alleged Damages And Causation

Assuming that plaintiff had demonstrated a breach of the Settlement Agreement's terms, it would also have had to demonstrate that it suffered damages caused by such breach in order to prevail on this motion. Plaintiff alleges that it suffered lost profits of approximately $10 million, based on the calculation of plaintiff's principal that it would have received $100 daily rental fees from 140 additional drivers over the period from June 27, 2012 through March 14, 2016, had defendants not breached their obligations under the Settlement Agreement. ECF No. 150, at 5; Mar. 14, 2016 Hearing Tr., ECF No. 156 at 88, 92–104. Plaintiff also seeks to recover $5000 for each of 85 automobiles that it purchased in expectation that it would use them in its operations, totaling $425,000, or, in the alternative, an order directing Newark to permit their licensure. ECF Nos. 150 at 5, 156 at 123–25 (here totaled as $480,000). Finally, plaintiff seeks $190,000 in attorney's fees. ECF No. 150 at 5.

The damages that plaintiff seeks to recover, aside from its demand for attorney's fees, consist largely of alleged lost profits that plaintiff contends it would have made had defendants enforced diligently the applicable laws against other autocab companies. Under applicable New

Jersey law, damages in the form of lost profits must be demonstrated with a "reasonable degree of certainty" and "[a]nticipated profits that are remote, uncertain or speculative . . . are not recoverable." *Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*, 206 N.J. 596, 609 (2011) (internal quotation marks omitted); *see also Stanley Co. of Am. v. Hercules Powder Co.*, 16 N.J. 295, 314 (1954). Similarly, opinions of the Third Circuit, as well as this Court, make clear that plaintiffs seeking to recover lost earnings may not rely on "speculative opinion" and must lay a proper factual foundation for any testimony regarding future earnings. *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 642–43 (3d Cir. 1987); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 754–55 (3d Cir. 2000); *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983); *Evans v. BV Shipping Co. Lombok Strait*, Civ. A. No. 07-3139 (RMB), 2009 WL 3233524, at *2–3 (D.N.J. Oct. 5, 2009); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 459–60 (D.N.J. 1998). Such cases have rejected a plaintiff's own opinion as to lost earnings as speculative and have stressed the importance of detailed, fact-based expert testimony. *See Elcock*, 233 F.3d at 756; *Benjamin*, 820 F.2d at 643; *Evans*, 2009 WL 3233524 at *2–3 ("Without the testimony of an expert . . . , and on the record now before the jury, an award of future lost income would be speculative and is therefore impermissible.").

Plaintiff's allegation of causation of its alleged lost profits is premised almost entirely upon its theory that defendants' failure to enforce the cap on autocab licensing allegedly created by local ordinances led to a glutted market that made plaintiff's operation of additional autocabs unfeasible and further competitively disadvantaged plaintiff by permitting other autocab companies to operate with smaller facilities and lower overhead. ECF Nos. 124-3 at 36–39, 150 at 5, 156 at 125. The Court already has rejected this theory of liability as lacking support in the text of the regulations in question, as well as in the City's interpretation of its own ordinances. *See supra* Section II.B.1. Furthermore, plaintiff relies almost entirely on testimony from its own principal, Mr. Saintil

27

Joseph, to establish that the autocab market is illegally oversaturated at its current levels, which testimony was largely speculative and composed of hearsay. Plaintiff did not present any expert testimony on damages (despite the adjournment of the evidentiary hearing to allow plaintiff sufficient time to provide expert reports to defendants, who objected to plaintiff's late declaration of its intention to present a damages expert or experts).[15]

Even assuming that some lapse by defendants in strict enforcement of the Autocab Code and NZLUR could have led to an increase in the number of competing autocabs or to a decrease in the cost of competitors' businesses, to plaintiff's relative disadvantage, plaintiff has still failed sufficiently to link any specific damages to such an alleged lapse. Mr. Joseph, operating under the assumption that enforcement of applicable laws would reduce all autocabs affiliated with other companies in Newark to a total of merely 10 competing autocabs, simply multiplies what he states is the going rate for autocab rental by a driver of $100 per day, by the 140 autocabs which he claims the Settlement Agreement "entitles" plaintiff to operate, for each day since the Settlement Agreement became effective. *See* ECF No. 156 at 92–104.

The problems with plaintiff's damages claim and calculations are numerous. As an initial matter, the damages testimony was presented solely by an autocab company owner, Mr. Joseph, and not by any economic damages expert competent to establish an accepted, non-speculative basis for plaintiff's claim of lost anticipated future earnings. Mr. Joseph did not claim to have any background or expertise in economic theory, and his layperson testimony on these issues was fraught with speculation and unproven assumptions.

---

[15]    Plaintiff was to have expert testimony on damages, but it withdrew its expert at the start of the damages hearing. *See* ECF No. 156 at 14–16. The expert who was put forward, Craig Rahencamp, purported to be knowledgeable about zoning issues but did not opine on damages (despite being called during the damages phase of the evidentiary hearing).

In addition, it was highly speculative for plaintiff to assume that, absent the alleged breaches by defendants, it would have operated 140 additional autocabs. The operative clause of the Settlement Agreement granted plaintiff, from August 31, 2011 to August 31, 2014, a "right to register, license, and operate up to 150 vehicles, . . . whose registration, licensing and operations shall be subject to the laws of autocabs existing as of August 31, 2011." ECF No. 124-5 at 4. As any person who complies with the applicable laws has a right to register an autocab, this paragraph cannot be read as having any effect other than exempting plaintiffs' autocabs (or up to 150 of them) from any changes made to laws and regulations between September 2011 and August 2014.[16] It serves no more as a guarantee of plaintiff's practical ability to license and operate 150 autocabs than it does as a legal cap on plaintiff's total number autocabs. In any case, though plaintiff apparently purchased 85 additional vehicles in expectation of using them in its business, it introduces no evidence or contention that it ever attempted to license any of them. Plaintiff fails to provide any explanation as to why defendants should bear the responsibility for plaintiff's apparent choice not even to attempt to register the 140 additional vehicles to which it claims entitlement. Plaintiff's argument is, essentially, that it was not economically viable for him to register more than the ten vehicles that it operated for the bulk of the time in question, but the Settlement Agreement included no guarantee that operating 150 vehicles would be practical or profitable.

Applying plaintiff's theory that a glutted autocab market diminished relative demand to the extent that it could not feasibly operate additional autocabs, plaintiff offers no assessment of the

---

[16]     This interpretation of the provision is strengthened by the sentence following the one quoted above: "Any and all changes in any of the laws pertaining to the registration, licensing, and operation of autocabs between August 31, 2011 through August 31, 2014 shall not apply to [plaintiff] is [sic] registering, licensing, and operating up to 150 cars during the three-year period." ECF No. 124-5 at 4.

extent to which rigid enforcement of the allegedly violated Autocab Code and NZLUR provisions discussed above would have alleviated the economic conditions disadvantageous to it. To frame the issue another way, plaintiff fails to address various other factors that could negatively have impacted the autocab market during the same period, with Mr. Joseph acknowledging, during his testimony, his failure to consider such theories in assessing damages. *See* ECF No. 156 at 51–52, 166–72, 191–92. For instance, plaintiff assumes that its inability to operate additional autocabs stems exclusively from an overabundance of competing autocabs and was not impacted by other factors that may well have affected market demand or its own competitiveness, such as plaintiff's removal of credit card processing equipment from its cars, ECF No. 156 at 207, the population's use of public transportation or unlicensed "gypsy" cabs, ECF No. 156 at 172–74, or the increasing prevalence of new competing ground-transportation companies, like Uber and Lyft, ECF No. 156 at 166–72, which have so frequently made headlines for the ire they inspire in operators of traditional taxicabs.[17] Indeed, evidence was presented at the evidentiary hearing conducted by the Court that other Newark autocab companies that plaintiff claims were given an unfair competitive advantage by defendants have suffered financially as well, with one having recently closed due to insufficient income to continue to operate its business. *See* Nov. 17, 2015 Hearing Tr., ECF No. 137 at 23.

In short, plaintiff's evidence relating to damages, consisting entirely of testimony of its own principal and unsupported by expert testimony, is insufficient to establish that plaintiff suffered any actual harm as a result of any breach of the Settlement Agreement by defendants.

---

[17]    *See, e.g.*, "Newark Cabbies Cry 'Corruption', Rally Against City's Uber Deal," NJ.com, http://www.nj.com/essex/index.ssf/2016/04/cabbies_rally_against_uber_deal_in_newark.html (April 20, 2016).

### III.    CONCLUSION

Given plaintiff's failure to prove a breach of the Settlement Agreement by defendants or damages resulting from any alleged breach, this Court recommends that plaintiff's motion to enforce the Settlement Agreement be **DENIED**.

Dated:  June 10, 2016

**Leda Dunn Wettre**
**United States Magistrate Judge**

Original:      Clerk of the Court
        cc:      Hon. Madeline C. Arleo, U.S.D.J.
                 All Parties